MELTZER, LIPPE, GOLDSTEIN
& BREITSTONE, LLP
190 Willis Avenue
Mineola, New York 11501
(516) 747-0300 (telephone)
Thomas J. McGowan, Esq.
*Attorneys for 226 East Montauk Highway Corporation*

Hearing Date:  April 19, 2017, 2:30 p.m.
Objections Due: April 12, 2017, 4:00 p.m.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
In re:                                              :
                                                    :
      **TANJU NUREL,**                          :  **Chapter 11**
                                                    :
              Debtor.            :  **Case No.: 8-17-71200 (ast)**
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY IN FURTHER SUPPORT OF MOTION
FOR AN ORDER GRANTING RELIEF
FROM THE AUTOMATIC STAY AND RELATED RELIEF**

**TO:  THE HONORABLE ALAN S. TRUST**
       **UNITED STATES BANKRUPTCY JUDGE**

226 East Montauk Highway Corporation ("**Movant**" or "**Landlord**"), by its attorneys, Meltzer, Lippe, Goldstein & Breitstone, LLP, sets forth the following in response to the Debtor's opposition to its motion (the "Opposition") which, to put it charitably, takes great liberties with the truth, and in further support of its motion for an Order:

    (a) granting relief from and terminating the automatic stay arising under Bankruptcy Code section 362 to permit the Landlord to proceed with its landlord-tenant proceeding against the Debtor in the Southampton Town Justice Court (No. 16100044) and to recover possession of its real property at issue; or as otherwise authorized by the State Court or applicable law;

    (b) waiving the 14-day stay imposed by Bankruptcy Rule 4001(a)(3); and

    (c) granting such other and different relief as the Court deems just and proper.

## THE LANDLORD'S MOTION SHOULD BE GRANTED
## BASED ON THE DEBTOR'S ADMISSIONS AND THE UNDISPUTED FACTS

### A.   The Debtor's Financial Admissions Establish His Bad Faith Filing

1.      The best evidence as to why the Landlord's motion to lift stay to allow his non-payment proceeding to proceed to trial in the Landlord-Tenant Court[1] should be granted without any delay comes from the Debtor himself.

2.      In Schedule "I" to his Chapter 11 petition, the Debtor states that his household income totals $4,859.22 per month and in Schedule "J" states that his household expenses totals $4,839.00 per month. *See* Ex. "22" to the Landlord's original motion. **None** of the items listed in the calculation of the Debtor's household expenses include the Rent and Additional Rent due the Landlord under the lease at issue (which total approximately $90,000 per year). *See Id*. The $20 monthly surplus reported by the Debtor (comparing his household monthly income to his household monthly expenses), of course, is grossly insufficient to pay the Rent and Additional Rent due the Landlord under the lease at issue. This alone establishes that the Debtor's filing was done in bad faith; **but it gets worse**.

3.      When asked by Alfred Dimino, Esq. of the U.S. Trustee's Office at the Section 341 meeting on May 7th to explain the discrepancy between the annual income reported by the Debtor in response to question 4 of his Statement of Financial Affairs for Individuals Filing For Bankruptcy in his petition of approximately $36,000 per year for the past three years in comparison to the Debtor's monthly income of $1,733 per month reported on Schedule "I" (i.e. $20,796 per year), the Debtor and his counsel clarified first that the income reported in the Debtor's petition as having been earned the past three years was the total income for his entire

---

[1] Terms not defined herein shall have the same meaning accorded them in the Landlord's original motion papers.

household (i.e. the Debtor and his wife) and not just the Debtor's annual income and second, that the monthly household income on Schedule "J" to the petition was overstated by a factor of two because the Debtor and his wife only work 6 months out of the year and thus **Schedule "J" reflects the monthly income of the Debtor and his wife only when they are actually working during those 6 months**.

4. When asked how he managed to pay his household monthly expenses (which are thus almost twice the amount of the Debtor's actual monthly household income when the latter is properly spread across the 12 months in a year rather than the 6 months that the Debtor and his wife work), the Debtor replied that he was using his credit cards and borrowing money from friends to live upon and would be amending his unsecured creditors schedule to include an additional four friends who have loaned money to him to pay his living expenses. Thus, the Debtor's reported monthly household expenses total $58,068.00 over the course of a year while his household income averaged only $36,000 per year for the past three years according to the Debtor.

5. **In short, <u>before</u> the Rent and Additional Rent due the Landlord are added to the Debtor's expenses, the Debtor has an annual deficit of $22,068.00 in paying just his annual household expenses**. This fact gleaned from Schedules "I" and "J" of the Debtor's petition and his statements at his Section 341 meeting irrefutably evidences that his reorganization is not remotely feasible here even before you add the approximately $90,000 per year due the Landlord in Rent and Additional Rent under the lease at issue. It gets even worse when you add the approximately $400,000 that the Debtor would have to pay to cure his default under the lease at issue in order to assume it as part of any reorganization and compare it to the

$5 in cash and $2,000 on deposit the Debtor reported as having on hand in his petition. *See* Ex. "22" to McGowan Aff. at Schedule A/B, items 16 and 17.

6. The foregoing establishes that the Debtor's bankruptcy petition was filed in bad faith in order to delay, as long as possible, the trial of the non-payment proceeding in the Landlord-Tenant Court that will lead to the Debtor's eviction from the premises as to which he has not paid any Rent or Additional Rent since October **2015** while the Debtor continues to operate a business there rent free[2].

7. It would be grossly inequitable for the Landlord to be further delayed in the recovery of his real property as to which he has invested in excess of $1.7 million to construct a building thereon (which is still not covered by insurance to be obtained by the Debtor as he is required to do under the terms of the lease at issue).

### B. The Debtor's Admissions That This Is A Two Party Dispute And That His Bankruptcy Petition Was Filed As "An Alternative To [Posting the State Court Ordered] Bond" In Order To Consolidate The State Court Proceedings Establish His Bad Faith Filing

8. Further evidence that the Debtor's petition was filed in bad faith include: (i) his repeated admission that this is a two party dispute (e.g., "[t]he Leases are the only liabilities of the Debtor which would require payment under a plan of reorganization" - Debtor's Opp. at ¶ 63) and (ii) his admission that "[t]he Suffolk Supreme Court required a bond of $200,000", "the Debtor was unable to secure such bond" and thus "in an effort to consolidate the matters [i.e. the Supreme Court Action and the non-payment proceeding,] . . . the Debtor determined that bankruptcy would present an alternative to a bond". *Id*. at ¶¶ 46, 47 and 49.

---

[2] Indeed, the Debtor evidences his intent to use this bad faith bankruptcy filing to delay his eviction as long as possible while not paying rent in his Opposition when he admits that he is "planning to move the Court for an extension of time to assume an unexpired lease", i.e. the lease between the Debtor and the Landlord. *See* Opposition at ¶ 98.

9. These admissions are further evidence that the Debtor's petition was filed in bad faith.

10. The Court should further note that the Supreme Court action, as counsel was advised by the undersigned at the April 7th Section 341 meeting, has been dismissed by the State Court. *See* Exhibit "35" to McGowan Reply Aff. Thus, the Debtor's bad faith purpose of filing for bankruptcy to "consolidate the [State Court] matters" instead of posting the Court-ordered bond to do so fails in any event.

11. The Debtor's admission that he filed his bankruptcy petition in order to "consolidate the [Supreme Court and Landlord-Tenant Court] matters" also establishes that, contrary to the *ipse dixit* contention otherwise in the Opposition, the bankruptcy filing was filed for the purpose of evading the issue he lost in State Court (i.e. the need to post a $200,000 bond to protect the Landlord before the two State Court actions would be consolidated). That issue had been litigated to a standstill given that the effort by the Debtor to get the State Court to set aside the need for such a bond had been rejected by the State Court. *See* the Debtor's fifth OSC annexed as Ex. "13" to McGowan Aff. (containing the Court's notation that it – "Refuse[s] to sign").

12. This is yet additional evidence of the Debtor's bad faith filing of his bankruptcy petition under the settled, and undisputed caselaw cited in the Landlord's moving papers.

**C. The Debtor's Business Has No Employees Besides The Debtor And His Wife And His Reliance On That Business To Establish A Reasonable Possibility Of Reorganization For Himself Is Demonstrably Unfounded**

13. The Debtor contends in his Opposition that, notwithstanding his financial admissions noted above evidencing otherwise, he "has a reasonable likelihood of reorganization" because the Debtor's business, TAM-NY, Inc., is operating the farmstand business under an oral

month-to-month lease from him at the Landlord's premises and thus pays rent to him which "the Debtor in turn pays to the Landlord". *See* Opposition at ¶¶ 57-62.

14.     The first, fatal flaw in this contention is that the Debtor has not in fact paid any Rent or Additional Rent to the Landlord since October 2015 despite due demand.

15.     A second, fatal flaw to this contention is that the lease at issue between the Landlord and the Debtor individually expressly provides that it cannot be subleased without the Landlord's prior written consent. *See* Ex. "19" to McGowan Aff. at Article 32 ("Lessee [i.e. the Debtor] may not assign or sublease all or any portion of the Premises without [the Landlord's] prior written consent"). The Debtor admitted at his Section 341 meeting that the Landlord had not given his consent to this alleged sublease.

16.     Thus, TAM-NY, Inc. is not a proper subtenant and cannot legally operate any business from the Landlord's premises.

17.     A further, fatal defect to this contention is that, even if TAM-NY, Inc. was a proper sub-tenant, which it is not, it does not generate profits to cover the Rent and Additional Rent due the Landlord under the lease at issue. For example, in the latest federal tax return previously obtained in discovery from the Debtor (i.e. its 2014 tax return), TAM-NY, Inc. reported that it **lost** $5,421 while paying rent of just $9,000 (or a small fraction of the actual Rent and Additional Rent that was owed by the Debtor to the Landlord under the triple net lease at issue). *See* the true copy of said return annexed as Exhibit "36" to the McGowan Reply Aff.

18.     Far from providing support for the Debtor's contention that TAM-NY, Inc., whose only employees according to the Debtor's statements at his Section 341 meeting are himself and his wife, the entity is losing money and thus evidences that there is in fact no possibility of reorganization by the Debtor.

19. This is yet a further reason to grant the Landlord's motion and lift the automatic stay to allow the Landlord to pursue its rights in Landlord-Tenant Court. As the Supreme Court noted in denying the Debtor's Fourth OSC, "[the Debtor's] submissions fail to establish that the [Landlord-Tenant Court] in which the summary [non-payment] proceeding is pending cannot afford the parties complete relief . . . or that the claims set forth in the affidavit of [the Debtor] cannot be asserted as affirmative defenses and counterclaims in the summary proceeding". *See* Ex. "14" to McGowan Aff.

20. This Court should lift the stay and allow this dispute to be resolved in Landlord-Tenant Court as it was scheduled to be resolved a month and one half ago on March 3rd until the Debtor filed his eve of trial bankruptcy petition to evade having that Court decide the dispute. The Debtor should not be rewarded for engaging in forum shopping.

### D. The Debtor's Lack Of Adequate Protection For The Landlord Mandates The Granting Of The Landlord's Lift Stay Motion

21. Although the Debtor contends that he "Attempted to Provide Adequate Protection" to the Landlord, the documentary evidence establishes that he did not do so nor even make a good faith attempt to do so.

22. First and foremost, the insurance policy with the terms required by the lease at issue has never been produced by the Debtor to the Landlord as both the 2011 Lease and the State Court so-ordered stipulation required him to do. *See* Exs. "19" and "30" to McGowan Aff.

23. Even now, the Debtor contends, without adducing any evidence in support, only that his "insurance broker has already sought to amend the policy to include permanent structures". Opp. at ¶ 90. The policy produced by the Debtor, however, names TAM-NY, Inc. and not the Debtor and the Landlord as insureds as the lease requires. *See* Ex. "31" to McGowan Aff.

24. There is no evidence this was ever done and the Debtor does not dispute that the insurance policy he did produce does not cover the building that the Landlord constructed at a cost in excess of $1.7 Million.

25. Indeed, the Court will note that the insurance policy produced by the Debtor expressly excludes from coverage "Property Damage to: (1) Property you own, rent or occupy . . .". *See* Ex. "31" to McGowan Aff. at item 2 ("**Exclusions**") (j) on p. 4 of 16.

26. Moreover, while the Debtor contends that TAM-NY, Inc. is operating the business at the premises, the 2011 Lease at issue requires that the Debtor get insurance naming him and the Landlord as insureds and containing the terms and conditions required under the lease. *See* Ex. "19" to McGowan Aff. at Article 20.

27. The Debtor makes no contention in his Opposition that he has the required policy or that he has even sought to obtain the required policy and instead contends, without support in the record, that TAM-NY, Inc. is the one who is obligated to provide the Landlord with the required policy even though the latter entity is not a party to the lease at issue and it is undisputed that the Landlord never gave the prior written consent needed for the alleged oral sublease. *See* Opp. at ¶¶ 87-93.

28. The lack of the required insurance policy alone mandates the granting of this lift stay motion based on the lack of adequate protection for the Landlord.

29. In addition, the failure of the Debtor to pay the post-petition Rent and Additional Rent in the amount of $23,580.71 which was due the Landlord on March 10, 2017 provides yet another basis for granting this lift stay motion based on the lack of adequate protection for the Landlord.

30. The Court will note that there is no dispute that:

a demand was sent on March 3rd to the Debtor's counsel setting forth the Rent and Additional Rent that was due the Landlord on March 10th which included proof of the items of Additional Rent due the Landlord (Ex. "24" to McGowan Aff.);

the Debtor's counsel assured that the Debtor was preparing to pay the Rent by March 10th and did not dispute that the Additional Rent was due (*Id.* at Ex. "25");

no payment was made to the Landlord for Rent or Additional Rent by March 10th and, thus, by the terms of the lease at issue, a 10% late charge is added to the Rent and Additional Rent that was due on March 10th (*Id.* at Ex. "19", Article 3.4);

it was not until five days <u>after</u> the Rent and Additional Rent was due on March 10th that the Debtor's counsel claimed for the first time that there was a "discrepancy" as to amount of Rent due (only) and admitting that he had reviewed the 2011 Lease at issue (*Id.* at Ex. "26"); and

the Debtor's counsel was advised on March 16th that the Rent due under the 2011 Lease increased by 3 ½ % each year , hence the $5,700.89 due for Rent on March 10th (*Id.* at Ex. "27").

31. Notwithstanding this undisputed documentary evidence, the Debtor: (i) first contends that a 2014 document is the operative lease between the parties (and thus only two years of rent increases at 3 ½% should be used); (ii) then contradicts himself by also contending that "the Debtor has asserted that no annual increases were to take effect" until the Landlord

provided a certificate of occupancy for the building it constructed; (iii) then contends that no Additional Rent is due the Landlord for March 2017 (after not disputing the Additional Rent was due in any of the letters noted above); and (iv) finally contends that the Landlord's "refusal to provide documentation [i.e. a signed copy of the 2011 Lease] prevented the Debtor from timely remitting payment [on March 10th]". Opp. at ¶¶ 8, 73, 75-80, and 27. The Debtor misspeaks.

32. The 2014 document is not and cannot be the operative lease between the parties as a matter of well settled, black letter law.

33. The first fatal flaw in the Debtor's assertion that the 2014 document is the operative lease between the Debtor and the Landlord is that the 2014 document expressly states that it is between the Landlord, an entity known as Nurel's Farm Stand, LLC (the "LLC") and the Debtor. *See* Opp. at Ex. "B".

34. The LLC, however, does not exist as evidenced by search conducted on the website of the New York Secretary of State for that entity annexed as Exhibit "37" to the McGowan Reply Aff.

35. In any event, even if the 2014 document was exclusively between the Landlord and the Debtor, which it is not, that document omits material terms rendering it unenforceable as a matter of well settled New York law. *See, e.g., Davis v. Dinkins*, 206 A.D.2d 365 (2d Dep't 1994)("**In order for an agreement . . . to be enforceable as a lease** [under NY's Statute of Frauds], **all the essential terms must be agreed upon** [cite omitted]. These **essential terms include** the area to be leased, **the duration of the lease, and the price to be paid** [cite omitted]. **If any of these essential terms are missing and are not otherwise discernible by objective means, a lease has not been created**")(emphasis added); *Rouzani v. Rapp*, 203 A.D.2d 446 (2d Dep't 1994)("**To satisfy the [NY] Statute of Frauds, a memorandum . . . must state all of the**

**essential terms of a complete agreement . . . [the memorandum at issue therein] does not contain all the essential terms of a commercial lease, such as a commencement date, a definite term** . . .")(emphasis added); *Olim Realty v. Lanaj Home Furnishings*, 65 A.D.3d 1318(2d Dep't 2009)("Enforcement of the 2001 lease was barred by the [NY] statute of frauds . . . the memorandum agreement . . . did not contain all of the essential terms of a complete agreement, such as the amount of rent due"); *Diaz v. De Martino*, 30 Misc.3d 135(A) (Sup. Ct. App. Term 2011)("In order to satisfy the statute of frauds, **the writing must state all of the essential terms of a complete agreement** [cites omitted], **including** the area to be leased, the **duration of the lease, and the rent to be paid** [cites omitted]")(emphasis added); *see also Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105 (1981)(NY **Court of Appeals** - "a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable**")(emphasis added).

36. Among other things, the 2014 document does **not** state when it would commence or terminate (which impacts various provisions throughout the document including but not limited to when the obligation to pay rent was to commence); and notes that the term "Proprietary Marks", upon which a portion of the rent to be paid was to be based, was not defined by the parties and instead was expressly noted as needing "**[to be defined]**" (emphasis original) in the document. *See* Ex. "B" to Opp. at Articles 2.1 and 3.3.

37. In short, the commencement and termination dates of the purported 2014 lease and the total amount that would be required to be paid for rent to the Landlord were left for further negotiations between the parties.

38. Since both of these items are material terms of a lease under the settled caselaw cited above, the 2014 document is nothing more than an agreement to agree and is unenforceable

as a matter of law under New York's Statute of Frauds (to wit, General Obligations Law § 5-703[2]) and the well settled caselaw noted above.

39. Thus, the Landlord's motion to lift stay should be granted in its entirety without delay since there is no genuine dispute that the 2011 Lease is the operative lease between the Landlord and the Debtor.

40. The Debtor is also judicially estopped from denying that the 2011 Lease is the operative lease between the parties.

41. This Court will note that, although the Debtor falsely contends that the 2011 Lease is not the operative contract between the Landlord and the Debtor and that the 2014 document which is missing material terms and includes an entity which does not exist which renders it unenforceable under New York law is the lease for the Premises at issue, this does not raise any genuine dispute warranting any delay in the granting of the automatic stay relief sought herein.

42. As noted in the Landlord's original motion, the Debtor obtained affirmative relief from State Court on a number of occasions based on his repeated assertion that the Landlord was violating his rights under the 2011 Lease.

43. Thus, for example, the Debtor sought and was granted a temporary restraining order ("TRO") on:

(i) May 6, 2016 which "enjoined [the Landlord] from taking any steps to remove plaintiff from the subject premises" (Ex. "1" to Motion) based on the Debtor's assertion that he had rights under the 2011 Lease which he attached as Ex. "B" to his affidavit in support (Ex. "2" to Motion);

(ii) June 17, 2016 which directed that the Landlord was "stay[ed] from commencing any lawsuit which seeks to terminate [the Debtor's] tenancy" (Ex. "3" to Motion) based on the Debtor's assertion that he had rights under the 2011 Lease attached to his affidavit as Exhibit "D" thereto and noting that the specific relief sought in his summons with notice attached to his affidavit was "[a]n Order enjoining the termination of the Lease dated May 11, 2011" (Ex. "4" to Motion); and

(iii) August 4, 2016 which stayed the landlord-tenant proceeding which was then pending between the Landlord and the Debtor in the Town of Southampton Justice Court (the "Landlord-Tenant Court") (Ex. "8" to Motion) based on the Debtor's assertion of rights under the 2011 Lease which he attached to his affidavit (*id.*) along with his verified complaint (Ex. "6" to Motion) which expressly sought "a judgment enjoining the termination of the lease dated May 11, 2011".

44. The foregoing TRO relief granted to the Debtor by the State Court based on his repeated assertion of rights under the terms of the 2011 Lease between the Debtor and the Landlord judicially estops him as a matter of settled law from disputing that the operative lease between the Landlord and the Debtor is the 2011 Lease. *See, e.g., In re Adelphia Recovery Trust*, 634 F.3d 678 (2d Cir. 2011); and *Intellivision v. Microsoft Corp.*, 484 Fed.Appx. 616 (2d Cir. 2012).

45. As noted by the Second Circuit, the Supreme Court has described the doctrine of judicial estoppel as being "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has

acquiesced in the position formerly taken by him. . . [Thus] judicial estoppel will apply if" 1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel" . . . [with] [t]he this requirement is sometimes couched in terms of 'unfair detriment (to) the opposing party' rather than advantage to the party to be estopped (cites omitted)". *In re Adelphia Recovery Trust*, 634 F.3d at 695-696; *quoting New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808 (2001).

46.     It has also been noted by the Second Circuit that "[j]udicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining an unfair advantage through the deliberate adoption of inconsistent positions in successive suits". *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000).

47.     Here, all of the elements for application of the doctrine of judicial estoppel are satisfied to estop the Debtor from now contending that the operative contract between the Landlord and the Debtor is the 2011 Lease.

48.     In addition, the Debtor expressly sought an injunction in his State Court verified complaint "**enjoining the termination of the lease, dated May 11, 2011** and for a further order declaring that [the Debtor] is in full compliance with all of the terms of said lease". *See* Ex. "6" to McGowan Aff. at ¶ 15 (emphasis added).

49.     It thus irrefutable that the Debtor is judicially estopped from playing fast and loose in now attempting to dispute that the 2011 Lease is the operative lease between him and the Landlord.

50. To the extent that the Debtor further frivolously contends that no increase in Rent was to be paid to the Landlord until a certificate of occupancy was issued for the building constructed by the Landlord, the Court will note that the 2011 Lease expressly requires an annual increase in Rent by 3 ½ %. *See* Ex. "19" to McGowan Aff. at Article 3.

51. The lease does <u>not</u> contain any provision which provides that no increase in Rent shall occur until a certificate of occupancy is issued. *See Id*. Moreover, the lease contains a provision precluding any oral modifications of that lease. *See Id*. at Article 33.2.

52. Thus, there is no genuine dispute that the annual 3 ½ % increases in Rent were due the Landlord under the terms of the lease at issue.

53. The Debtor's further contention that no post-petition Additional Rent demanded by the Landlord is due (Ex. "24" to McGowan Aff.) is also frivolous and no bar to the immediate lifting of the automatic stay to allow the Landlord to pursue his non-payment proceeding in Landlord-Tenant Court.

54. As noted by the Debtor in his Opposition (i.e. at ¶ 76), Article 6 of the 2011 Lease provides that Additional Rent is due "[u]pon presentation" of such items for payment to him.

55. Notwithstanding this plain term, the Debtor nevertheless contends that the dates of the items included as Additional Rent for the post-petition payment due on March 10th predate the filing and thus, even though the Landlord never demanded payment of these items before doing so as part of the Additional Rent due March 10th, [3] these items are actually required to be paid by the Debtor before demand is ever made.

---

[3] The Court should note that, while the Debtor contends in his Opposition that the "Landlord has made previous demands for these additional rents in both the May Demand [Ex. "A" to Ex. "4" to the McGowan Aff.] and the August Demand [Ex. "10" to McGowan Aff.], this is knowingly and demonstrably false. First, the items included as Additional Rent for March 2017 are all dated <u>after</u> the May and August Demands and thus could not be included in those

56.     The Debtor, of course, cites no provision of the 2011 Lease providing support for this contention. He cannot.

57.     Additional Rent is due under the plain terms of the 2011 Lease only when the Landlord makes demand for payment of same. *See* Ex. "19" to McGowan Aff. at Article 6.

58.     The Court will also note that among the items included in the Additional Rent demanded for March 2017 are real estate taxes for time periods that include post-petition periods of time. *See* Ex. "24" to McGowan Aff.

59.     The Debtor's failure to pay the Rent and Additional Rent that was due on March 10th is further evidence that the Landlord is not being provided adequate protection.

60.     The lift stay motion should thus also be granted on this basis as well.

61.     The Debtor's final contention as to why the lift stay motion should not be granted due to the lack of adequate protection being provided to the Landlord, to wit, that the Landlord's "refusal to provide documentation [i.e. a signed copy of the 2011 Lease and the 2014 document] prevented the Debtor from timely remitting [the Rent] payment [on March 10th]" (Opp. at 27) is also demonstrably false.

62.     The Debtor's counsel not only stated on March 6th that rent would be paid by March 10th (*see* Ex. "25" to McGowan Aff.), he did not request copies of the signed 2011 Lease and the 2014 document until 6 days **after** the Rent and Additional Rent had to be paid on March 10th in order to any such payment to be timely *Id.* at Ex. "34".

63.     He also noted in that letter that his "client has previously provided to us several documents, including both signed and unsigned versions of the lease . . ." and, in a letter dated

---

demands. They also were not included in those demands. *Compare Id* to Ex. "24" of the McGowan Aff.

the day before, admitted that he had "reviewed the 2011 Lease Agreement and 2014 Lease Agreement". *See Id.* and Ex. "26" to McGowan Aff.

64.     The only thing that prevented the Debtor from timely paying his post-petition Rent and Additional Rent on March 10th was his failure to have the funds to do so.

65.     Given that the Debtor has not paid the Landlord any Rent or Additional Rent since October **2015**, there is no equitable reason to delay the Landlord any further in recovering his premises from the Debtor through the non-payment proceeding in the Landlord-Tenant Court.

66.     Indeed, as evidenced above, the Landlord has irrefutably established that the Debtor filed his bankruptcy petition on the eve of the Landlord-Tenant Court trial in bad faith and has continued cause for lifting the automatic stay herein by failing to provide the Landlord with adequate protection as Bankruptcy Code § 362(d)(2) requires. *See, e.g., In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997); *In re Muniz*, 1999 WL 182588 (S.D.N.Y. 1999); *In re 68 West 127 Street, LLC*, 285 B.R. 838 (Bankr. S.D.N.Y. 2002); *In re Kornhauser*, 184 B.R. 425 (Bankr. S.D.N.Y. 1995); *Manhattan King David Restaurant Inc. v. Levine*, 163 B.R. 36 (S.D.N.Y. 1993).

67.     In sum, the automatic stay should be vacated to allow the Landlord to proceed with its eviction proceeding in Landlord-Tenant Court on the ground that the Debtor's bad faith filing constitutes cause for doing so.

## CONCLUSION

The Landlord respectfully requests that the Court enter an Order:

(a) granting relief from and terminating the automatic stay arising under Bankruptcy Code section 362 to permit the Landlord to proceed with its landlord-tenant proceeding against the Debtor in the Southampton Town Justice Court (No. 16100044) and to recover possession of its real property at issue; or as otherwise authorized by the State Court or applicable law;

(b) waiving the 14-day stay imposed by Bankruptcy Rule 4001(a)(3); and

(c) granting such other and different relief as the Court deems just and proper.

Dated: Mineola, New York
April 13, 2017

                MELTZER, LIPPE, GOLDSTEIN
                & BREITSTONE, LLP

           By: */s/ Thomas J. McGowan*
                Thomas J. McGowan, Esq.
                190 Willis Avenue
                Mineola, New York 11501
                (516) 747-0300
                *Attorneys for the Landlord*
                *226 East Montauk Highway Corporation*